# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 04-3183

RALPH NADER, *et al.*,

*Plaintiffs-Appellants,*

*v.*

JOHN KEITH, *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court for
the Northern District of Illinois, Eastern Division.
No. 04 C 4913—**Matthew F. Kennelly**, *Judge*.

ARGUED SEPTEMBER 20, 2004—DECIDED SEPTEMBER 22, 2004
OPINION PUBLISHED SEPTEMBER 29, 2004

Before POSNER, WOOD, and EVANS, *Circuit Judges*.

POSNER, *Circuit Judge*. Ralph Nader, joined by his campaign committee and two registered Illinois voters who support his candidacy, brought this suit to require the State of Illinois to place his name on the ballot for the forthcoming Presidential election. He appeals to us from the district court's denial of a preliminary injunction that would order the state to do that. We have expedited the parties' briefing and our consideration of the appeal because of the short time remaining to the election.

The suit challenges, as violations of the First and Fourteenth Amendments, *Munro v. Socialist Workers Party*, 479 U.S. 189, 193 (1986); *Anderson v. Celebrezze*, 460 U.S. 780, 786-88 (1983); *Bullock v. Carter*, 405 U.S. 134, 142-44 (1972); *Libertarian Party of Illinois v. Rednour*, 108 F.3d 768, 772-73 (7th Cir. 1997), three provisions of the Illinois Election Code that have in combination prevented Nader from qualifying for a place on the ballot. The first provision requires any candidate who has not been nominated by a party that received at least 5 percent of the votes in the most recent statewide election to obtain nominating petitions signed by at least 25,000 qualified voters. 10 ILCS 5/10-2, -3. The second provision requires that the address on each petition be the address at which the petitioner is registered to vote. *Id.*, 5/3-1.2. The third requires that the petitions be submitted to the state board of elections at least 134 days before the election. *Id.*, 5/10-6. The deadline this year was thus June 21. Only two states, Texas and Arizona, had earlier deadlines.

Nader declared his candidacy on February 22, which gave him four months to drum up support for his presidential bid, though a provision of the election code that he does not challenge required him to wait until the ninetieth day before the expiration of the June 21 deadline to begin circulating the actual petition forms for signature. 10 ILCS 5/10-4. On June 21 he turned in 32,437 petitions. More than 19,000 of these were challenged by defendant John Tully, whom Nader describes as a "minion" of the Illinois Democratic Party. The principal ground for challenging a petition was that the petitioner wasn't registered to vote at the address shown on it. After state administrative hearings, 12,327 petitions were struck, which brought Nader's total below 25,000. Nader's campaign continued to obtain petitions after the June 21 deadline, and by August 19, when the district court held a hearing on the motion for a preliminary

injunction, another 7,000 or so had been collected, but the election board refused to consider them because they were untimely.

Nader also sued in state court, where he sought a ruling that the board's refusal to certify his candidacy violated Illinois state law. That proceeding is pending, and the board argues frivolously that its pendency requires dismissal of Nader's federal suit by virtue of the doctrine of *Younger v. Harris*, 401 U.S. 37 (1971). That decision and cases following it, such as our *Majors* case on which the board particularly relies, *Majors v. Engelbrecht*, 149 F.3d 709 (7th Cir. 1998), hold (with irrelevant exceptions) that if a person is believed to have violated a state law, the state has instituted a criminal, disciplinary, or other enforcement proceeding against him, and he has a federal defense, he cannot scurry to federal court and plead that defense as a basis for enjoining the state proceeding. *Ohio Civil Rights Comm'n v. Dayton Christian Schools, Inc.*, 477 U.S. 619, 626-28 (1986); *Middlesex County Ethics Committee v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982); *Hoover v. Wagner*, 47 F.3d 845, 848 (7th Cir. 1995); *Storment v. O'Malley*, 938 F.2d 86 (7th Cir. 1991); *Anthony v. Council*, 316 F.3d 412, 419-22 (3d Cir. 2003). That is not this case. Nader is not accused of having violated any state law, and the state has not instituted any proceedings against him; he merely is pursuing parallel remedies against the state's refusal to certify him as a candidate. Federal courts do sometimes stay their hand when parallel state judicial or administrative proceedings are pending ("*Colorado River*" abstention, see, e.g., *Clark v. Lacy*, 376 F.3d 682, 685 (7th Cir. 2004); *CIGNA Healthcare of St. Louis, Inc. v. Kaiser*, 294 F.3d 849 (7th Cir. 2002), or "*Burford*" abstention, see, e.g., *International College of Surgeons v. City of Chicago*, 153 F.3d 356, 361-65 (7th Cir. 1998)), but the election board has made no effort to fit this case to that mold—and it couldn't, if only because of the time factor. Abstention would almost certainly moot Nader's case.

Nader argues that the three rules that in combination ruled him off the ballot impose an unreasonable burden on third-party and independent (nonparty) candidacy (though the Libertarian Party's candidate was able to qualify), and if this is so the rules are unconstitutional. *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 357-59 (1997); *Burdick v. Takushi*, 504 U.S. 428, 432-34 (1992); *Schulz v. Williams*, 44 F.3d 48, 56 (2d Cir. 1994); *Cromer v. South Carolina*, 917 F.2d 819, 822-23 (4th Cir. 1990). Nader emphasizes the role that third parties have played in American democracy. The Republican Party started as a third party; and such third parties as the Progressive Party of Theodore Roosevelt, LaFollette's Progressive Party, and the Reform Party have made significant contributions to political competition, whether by injecting new ideas or, in the case of the Republican Party, by actually displacing one of the major parties.

So the barriers to the entry of third parties must not be set too high; yet the two major parties, who between them exert virtually complete control over American government, are apt to collude to do just that. For like other duopolists they would prefer not to be challenged by some upstart—although if a major party believes that a third party will take more votes from the other party than from itself, it will support that third party (surreptitiously, because it's supporting an ideological opponent), and the other party will oppose it (also surreptitiously, because it's opposing an ideological ally). That is why Nader assumes that Tully is a "minion" of the Democratic Party—but we should point out that there was no basis for joining him as a defendant. Tully is not a state actor, and he is not conspiring with the board of elections to keep Nader off the ballot.

It doesn't follow from what we said about the importance of preserving opportunities for the entry of new parties into the political arena that it would be a good thing if there

were no barriers at all to third-party candidacies. A multi-plication of parties would make our politics more ideological by reducing the influence of the median voter (who in a two-party system determines the outcome of most elections), and this could be a very bad thing. More mundanely, terminal voter confusion might ensue from having a multiplicity of Presidential candidates on the ballot—for think of the confusion caused by the "butterfly" ballot used in Palm Beach County, Florida in the 2000 Presidential election. That fiasco was a consequence of the fact that the ballot listed ten Presidential candidates. The butterfly ballot was a folded punchcard ballot in which the ten candidates were listed on facing pages. This unusual design was innocently adopted in order to enable the candidates' names to be printed in large type, in consideration of the number of elderly voters in the county, while at the same time placing all the candidates for each office in sight of the voter at one time so that he would be less likely to overvote. Another ballot design might have effectively disfranchised voters who had poor eyesight, or who cast their vote before realizing there were additional candidates for the same office on the next page of the ballot, or who cast two votes for candidates for the same office because they didn't realize that candidates for the same office appeared on different pages. But with names on each side and the chads (the places in the ballot that the voter punches out in order to vote) in the middle, it was easy to punch the chad of the candidate on one of the facing pages meaning to vote for the candidate on the opposite page. Apparently a significant number of voters did just that: intending to vote for Al Gore, they voted for Patrick Buchanan. With fewer candidates, the "butterfly" design and resulting confusion would have been avoided.

Less obviously, third-party candidates would themselves be harmed if there were no barriers to including such candidates on the ballot. It is to the Libertarian Party's advan-

tage that if Nader's challenge fails, its candidate will be the only independent candidate for President on the ballot. If there were 98 independent candidates, none could hope for a nontrivial vote.

So there have to be hurdles to getting on the ballot and the requirement of submitting a minimum number of nominating petitions is a standard one. In a state the size of Illinois—the population exceeds 12 million, of whom more than 7 million are registered voters—requiring a third-party candidate to obtain 25,000 signed nominating petitions cannot be thought excessive. *Jenness v. Fortson*, 403 U.S. 431 (1971), upheld a Georgia law that required petitions from 5 percent of the registered voters—in Illinois that would mean 350,000 petitions! Equally stringent requirements have been upheld in other cases. See *American Party of Texas v. White*, 415 U.S. 767, 783-84 (1974); *Libertarian Party of Illinois v. Rednour, supra*, 108 F.3d at 775; cf. *Prestia v. O'Connor*, 178 F.3d 86, 87-89 (2d Cir. 1999); compare *Storer v. Brown*, 415 U.S. 724, 739-40 (1974).

And especially in a state as notorious for election fraud as Illinois is, see, e.g., "Voting Rights Act: Criminal Violations," *Hearings Before Subcomm. on the Constitution of the S. Comm. on the Judiciary*, 98th Cong., 1st Sess. 4 (1983) (testimony of Dan Webb, U.S. Attorney for the Northern District of Illinois); Dayna L. Cunningham, "Who Are to Be the Electors? A Reflection on the History of Voter Registration in the United States," 9 *Yale L. & Policy Rev.* 370, 396-97 (2001); Todd J. Zywicki, "The Law of Presidential Transitions and the 2000 Election," 2001 *B.Y.U.L. Rev.* 1573, 1607-08 (2001), the fact that the nominating petitions that a candidate submits have actually been signed by registered voters has to be verified. If the petition were not required to contain any identifying information (such as date of birth, mother's maiden name, or, the identifier that Illinois has chosen, the address at

which the petitioner is registered to vote), there would be no practical impediment to a person's signing the name of anyone he knew to be a registered voter.

Other states may be able to rely on an honor system. Oregon, for example, has switched to a system of all-mail voting. O.R.S. § 254.465. But "what works in the state of Oregon doesn't necessarily work in Illinois, especially in light of the colorful history of vote fraud we've seen," Andrew Zajac, "Wider Access to Absentee Ballots Sought; Lawsuit Challenges Illinois Voting Law," *Chi. Tribune,* Sept. 8, 2004, p. 11 (quoting the general counsel of the state election board); for voting by mail makes vote fraud much easier to commit. Michael Moss, "Absentee Votes Worry Officials As Nov. 2 Nears," *N.Y. Times,* Sept. 13, 2004, p. A1. An additional reason to insist that a nominating petitioner list his current address is that if he has moved out of the county in which he is registered without re-registering, he may be ineligible to vote and therefore ineligible to execute a nominating petition.

Of course a law requiring verification could require so much or such esoteric information that most petitions would be invalidated. The best way of evaluating this danger is to determine the total number of petitions that a third party would have to submit in order to be reasonably confident of having enough valid ones to get on the ballot. Almost one-third of the Nader petitions were invalidated. So if instead of 32,000 petitions his campaign had collected 37,500 and a third had been invalidated, there would have been 25,000 valid petitions, and Nader would be on the ballot. If 25,000 is not an excessive number to require, neither is 40,000 (to provide an extra margin of error), for that is only slightly more than one-half of one percent of the number of registered voters in Illinois.

But is it reasonable to require that the minimum number of nominating petitions all be collected by June 21 when the election is not until November 2? June 21 preceded both major parties' conventions, and depending on what occurred there a third-party candidacy might generate a degree of support that it could not have attracted earlier. The problem is that time has to be allowed between the deadline for petitions and the election to enable challenges to the validity of the petitions to be made and adjudicated and then to enable a ballot to be printed and distributed that will contain the names of all the candidates—and the ballot must be printed well before the election so that it can be distributed to registered voters who vote by absentee ballot.

But how much time? One hundred thirty-four days—almost four and a half months—seems awfully long. Too long, seems to be the judgment of 47 of the other 49 states. A 120-day deadline was upheld in *American Party of Texas v. White, supra,* 415 U.S. at 787 n. 18, but it had not been separately challenged and it was not separately discussed. In *Anderson v. Celebrezze, supra,* on which the plaintiffs primarily rely, the Court invalidated a seven-month deadline, and though it was much longer than Illinois's 134 days and Ohio had not argued that it needed that much time "to allow petition signatures to be counted and verified or to permit November general election ballots to be printed," *id.* at 800, the Court noted, though noncommittally, that the district court had found that 75 days should be enough. *Id.* at 800 n. 28. The Court also emphasized that deadlines that states set for qualifying a candidate in a national election must be scrutinized with particular care because they have effects outside the states imposing them; a strong third-party showing could sway the outcome of the Presidential election. *Id.* at 794-95.

Restrictions on candidacy must, moreover, be considered together rather than separately. *Wood v. Meadows,* 207 F.3d

708, 711 (4th Cir. 2000). (This, incidentally, makes it difficult to rely heavily on precedent in evaluating such restrictions, because there is great variance among the states' schemes.) The fewer nominating petitions required to put a candidate on the ballot and the harder it is to challenge a petition (and so the lower the number of petitions above the minimum that a candidate must submit in order to be on the safe side), the shorter the deadline for submitting petitions can be made without unduly burdening aspiring candidates. Illinois requires a substantial though not paralyzing number of petitions, makes challenges easy rather than hard (since a discrepancy between the address on the petition and the address at which the petitioner is registered is likely to be pretty common even without fraud), and sets a tight deadline for submitting a qualifying number. In these circumstances, the tightness of the deadline can be questioned.

But we must not overlook another variable in a system of ballot access, and that is the procedure for resolving challenges to nominating petitions. The more extensive the procedure that a state provides, the more time the state will need in order to determine whether a candidate has qualified. Illinois, perhaps out of sensitivity to the state's history of voting fraud, has decided to allow candidates to respond to challenges, and this decision requires pushing back the deadline for submitting petitions by increasing the amount of time required to determine whether the candidate has obtained the requisite number of valid petitions. A state that employed a purely ex parte procedure for resolving challenges could set a later deadline for submission of petitions. But Nader does not question the appropriateness of the state's entitling him to rebut challenges to his nominating petitions. With 19,000 challenges to consider one by one and the Nader campaign entitled to rebut all 19,000, the board of elections needed a significant amount of time for resolving challenges and only after doing so could it print up the

ballots (unless it printed a double set of ballots—one with, one without, Nader's name, an expedient that has not been suggested). At argument Nader's lawyer claimed that the 19,000 challenges could all have been resolved within five to eight days. That seems preposterous and in any event no attempt has been made to substantiate the figure.

Well, even given the expanded procedure, is 134 days *really* a reasonable period for resolving challenges and printing and distributing ballots? Couldn't that be done quicker? Maybe so, but Nader has not presented evidence that would enable a court to prescribe a shorter period. We cannot micromanage the regulation of the electoral process to the degree he seeks.

Even if he has a better case on the merits than we think, he has not made a persuasive case for the extraordinary remedy of a preliminary injunction against a state agency. Remember that between the expiration of the statutory deadline and August 19, his campaign collected another 7,000 petitions. Were August 19 the deadline instead of June 21, we do not think it would be argued that the deadline was still too tight; nor do we understand Nader to be making such an argument, or to be arguing that if that were the deadline he would have collected more than 39,437 petitions (32,437 + 7,000). If a third of those are invalid, he is perilously close to the 25,000 minimum. Yet he argues not that the state election board should verify the 7,000, but that that number, though it undoubtedly includes many invalid petitions, should be added to his 20,182 total of verified petitions, carrying him above the 25,000 threshold. That is an improper procedure; his proposing it suggests that he is pessimistic that he actually has 25,000 valid petitions.

It also is unlikely that the 134-day rule, though it could prevent some third-party candidates, and perhaps even Nader in different circumstances, from having a reasonable

shot at collecting the qualifying number of nominating petitions, could have made a difference to Nader's ability to collect petitions in this year's election campaign. Long before the June deadline it was not only certain who the major parties' candidates would be but their positions were well known, the candidates were campaigning vigorously, there was a high level of public interest in the campaign, Nader himself had been campaigning since February, and he has long been a well-known national figure with more name recognition than Senator Kerry had before Kerry entered the Democratic primary. If Nader could not obtain nominating petitions from (realistically, to supply a comfortable margin of error) 40,000 of Illinois's 7 million registered voters, the implication is that his popular appeal in Illinois in the forthcoming election is slight. With 90 days to collect the 40,000 petitions, and 100 canvassers working to collect them, each canvasser would have to collect an average of only 4 to 5 a day ($40,000 \div 90 \div 100 = 4.44$). If Nader could not recruit 100 canvassers in Illinois, his electoral prospects were dismal indeed.

Moreover, it would be inequitable to order preliminary relief in a suit filed so gratuitously late in the campaign season. It wasn't filed until June 27, only a little more than four months before the election. If when he declared his candidacy back in February Nader had thought as he now does that the Illinois Election Code unconstitutionally impaired his chances of getting a place on the ballot, he could easily have filed suit at the same time that he declared his candidacy—especially as he had filed a similar suit the last time he ran for President, in 2000, when he obtained a preliminary injunction that got him on the Illinois ballot by allowing him to submit petitions collected after the deadline, *Nader 2000 Primary Committee v. Illinois State Board of Elections*, No. 00 C 4401 (N.D. Ill. 2000), though no final judgment was ever entered. There would be no question of his standing to seek

such relief in advance of the submission or even collection of any petitions. *Krislov v. Rednour*, 226 F.3d 851, 857-58 (7th Cir. 2000); cf. *Jenness v. Fortson, supra*, 403 U.S. at 432 (assuming standing). For while he could not have known before June 21 whether he could comply with the election code, it was certain that it would cost him more to do so than if the challenged provisions were invalidated.

By waiting as long as he did to sue, and despite the strenuous efforts by the district court and this court to expedite the litigation, Nader created a situation in which any remedial order would throw the state's preparations for the election into turmoil. Absentee ballots have already been mailed to voters who will be overseas on election day, see 42 U.S.C. § 1973ff-2(e)(2), and the remaining absentee ballots will be mailed on September 23. 10 ILCS 5/19-4, 5/16-5.01; State Board of Elections, *State of Illinois Election and Campaign Finance Calendar 2004*, pp. 27-30, http://www.elections.state.il.us/ElecInfo/Pages/Downloads/PDF/2004cal.pdf. At argument Nader's lawyer offered no reason for the delay in filing the suit.

We are mindful that the right to stand for office is to some extent derivative from the right of the people to express their opinions by voting, e.g., *Munro v. Socialist Workers Party, supra*, 479 U.S. at 193; it was doubtless to remind us of this that Nader's lawyers added two prospective voters as plaintiffs. But nothing is more common than for the denial of an injunction to harm innocent nonparties, such as people who would like to vote for Nader but unlike the two voter plaintiffs are not complicit in his decision on the timing of the suit. But there are innocents on the other side as well—the people who will be harmed if a last-minute injunction disrupts the Presidential election in Illinois. And Nader's supporters can cast write-in votes for him in November.

So, all things considered, we cannot say that the district judge abused his discretion in refusing to issue a preliminary injunction.

AFFIRMED.

A true Copy:

     Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*