In the

# United States Court of Appeals
### For the Seventh Circuit

No. 05-4355

DAVID LEE,

*Plaintiff-Appellant,*

*v.*

JOHN KEITH, in his official capacity as
Chairman of the Illinois State Board of Elections,
JESSE SMART, in his official capacity as
Vice-Chairman of the Illinois State Board of Elections,
WANDA REDNOUR, in her official capacity as a member
of the Illinois State Board of Elections, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 04 C 3042—**Jeanne E. Scott**, *Judge.*

ARGUED JUNE 9, 2006—DECIDED SEPTEMBER 18, 2006

Before RIPPLE, MANION, and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge.* In 1975 and 1979 Illinois adopted
two significant changes to its ballot access laws for inde-
pendent candidates. First, the deadline for independents to
file nominating petitions was pushed back from 92 days
before the November general election to the same deadline
that applies to partisan candidates—92 days before the
March primary, or 323 days before the November general

election. Second, the signature requirement for independent candidates was doubled, from 5% of the vote in the last general election for the office sought to 10%. These changes had a dramatic impact. Before 1975, independent candidates for the state legislature qualified for the ballot occasionally, though not frequently. Since 1980, however—the year following the second of these changes—not a single independent candidate for state legislative office has qualified for ballot access.

David Lee wanted to run as an independent candidate for the Illinois State Senate in 2004. When it became clear to Lee that he could not muster the required number of signatures by the deadline so distant from the general election, he abandoned his campaign bid and filed this lawsuit against the members of the Illinois State Board of Elections to challenge the ballot access restrictions. He asserted that the restrictions violated his First and Fourteenth Amendment rights as a candidate and voter by erecting an unconstitutionally high barrier to ballot access for independent candidates running for the state legislature. The district court upheld the challenged statutes.

We reverse. In combination, the ballot access requirements for independent legislative candidates in Illinois—the early filing deadline, the 10% signature requirement, and the additional statutory restriction that disqualifies anyone who signs an independent candidate's nominating petition from voting in the primary—operate to unconstitutionally burden the freedom of political association guaranteed by the First and Fourteenth Amendments. Ballot access barriers this high—they are the most restrictive in the nation and have effectively eliminated independent legislative candidacies from the Illinois political scene for a quarter of a century—are not sustainable based on the state's asserted interest in deterring party splintering, factionalism, and frivolous candidacies.

## I.  Background

The relevant facts are not in dispute. Illinois law requires an independent candidate for the General Assembly—the State Senate and House of Representatives—to qualify for the general election ballot by collecting the signatures of registered voters in his or her legislative district equal to at least 10% of the number of votes cast in that district during the last general election. *See* 10 ILL. COMP. STAT. 5/10-3 (2004). Anyone who signs an independent's petition is disqualified from voting in the primary election. *See* 10 ILL. COMP. STAT. 5/7-43(c). Aspiring independent candidates must file their nominating petitions with the required number of valid signatures by the same deadline that applies to partisan candidates: 92 days before the primary, which is 323 days before the general election. *See* 10 ILL. COMP. STAT. 5/7-12(1). This early deadline for independent candidates was adopted in 1975, *see* 1975 Session Laws, Act 79-1100 at 3400; the prior deadline was 92 days before the general election. All signatures must be collected within the 90 days immediately preceding the filing deadline. *See* 10 ILL. COMP. STAT. 5/10-4.

Prior to 1979 when the 10% requirement was adopted, *see* 1979 Session Laws, Act 81-155 at 816, Illinois law required independent candidates to collect registered voter signatures equal to only 5% of the votes cast in the previous general election. The record reflects that from 1956 through 1978, 16 independent General Assembly candidates qualified for the general election ballot. But after Illinois doubled the signature requirement to 10% in 1979, only three independents qualified in the 1980 election, and no independent legislative candidate has qualified for the ballot since then.

General Assembly candidates who are not affiliated with an established political party may also qualify for the general election ballot by filing as "new party" candidates. A new party candidate must collect signatures from registered voters in his or her district totaling at least 5% of the

number of votes cast in that district during the last general election and must submit these signatures 134 days before the general election. *See* 10 ILL. COMP. STAT. 5/10-2; 10 ILL. COMP. STAT. 5/10-6. Voters who sign the new party candidate's petition must affirmatively declare their intention to form a new party. *See* 10 ILL. COMP. STAT. 5/10-2, ¶ 4. As with independent candidates, new party candidates must collect signatures within the 90 days immediately preceding the filing deadline. *See* 10 ILL. COMP. STAT. 5/10-4. Other than having the required number of registered voters sign nominating petitions and declare their intention to form a new party, candidates running for General Assembly under a new party banner need not establish any formal party machinery or field a slate of candidates for any additional offices. But if a new party candidate wins the general election, he or she must organize the party's members to hold a primary election in order to appear on subsequent general election ballots for reelection. *See Vasquez v. Mun. Officers Electoral Bd.*, 450 N.E.2d 1379, 1381-82 (Ill. App. Ct. 1983).

By way of comparison to the other 49 states, Illinois's deadline for independent legislative candidates to file signed nominating petitions—323 days before the general election—was by far the earliest for the 2004 election. Ohio's March 1, 2004 deadline was the next earliest, but even that was two-and-a-half months later than Illinois's December 15, 2003 cutoff. Thirty-nine states set their filing deadlines at June 1 of the election year or later.[1]

Illinois's signature requirement—at least as it applied to Lee during the 2004 election—was likewise more stringent than any other state's. The easiest comparison is with the

---

[1]  A handful of states did not elect state legislators in 2004, so the dates and numbers we cite for filing deadlines and signature requirements are based on the laws that governed those states' most recent legislative elections, either in 2002 or 2003.

27 states that, like Illinois, require independent candidates to collect signatures from registered voters equal to a specified percentage of the votes cast in the previous general election. Among this group of 28 states, Illinois's 10% signature requirement stands alone: it is the only one that exceeds 5%.

Some states require independent candidates to collect signatures equal to a percentage of all registered voters in the district. Georgia and South Carolina have the most demanding requirements among this group, requiring signatures equal to 5% of the number of registered voters in the district. Five percent of all registered voters may be more or less than 10% of all votes cast in the preceding general election, so a useful comparison with Illinois's laws requires a bit of arithmetic. The record shows Lee needed to collect 6995 valid signatures to qualify for the 2004 general election ballot for the 44th Senate District. We do not know how many voters were registered in Lee's district from September to December 2003 (the 90-day window for Lee to collect signatures), but as of May 2005, there were 144,970 registered voters. No one suggests this number of total registered voters changed in any significant way between 2003 and 2005, so we use the 2005 number for our calculations.

The preliminary calculation is as follows: 6995 (the number of signatures Lee was required to collect) divided by 144,970 (the number of total registered voters) equals .048 (rounded off). So for comparison purposes, Lee needed to collect signatures from 4.8% of all *registered* voters in his district. But any realistic analysis must also account for the fact that voters who sign an independent's petition cannot vote in the primary election. In Illinois's 44th Senate District, 21,459 voters participated in the 2004 primary election for State Senate. Based on the sensible assumption that these voters would not have wanted to disqualify themselves from primary participation by signing an

independent's petition, we can subtract them from the eligible pool of petition signers. Accordingly, 144,970 minus the 21,459 primary voters leaves 123,511; 6995 divided by 123,511 equals about .057, or 5.7%. The result of all this number crunching is that when measured as an approximate percentage of eligible *registered* voters, Illinois's signature requirement for Lee in 2004 was 5.7%.

After realizing he would not be able to collect the required 6995 signatures by the mid-December deadline, Lee quit his bid for the State Senate and challenged the Illinois ballot access statutes by filing suit against the members of the Illinois State Board of Elections.[2] The parties filed cross-motions for summary judgment, and the district court entered judgment for the defendants, relying largely on this court's opinion in *Stevenson v. State Board of Elections*, 794 F.2d 1176 (7th Cir. 1986). Lee appeals.

## II. Discussion

We review the district court's entry of summary judgment de novo and draw all reasonable inferences in favor of the nonmoving parties. *Scaife v. Cook County*, 466 F.3d 735, 738-39 (7th Cir. 2006). Summary judgment should be entered only where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Scaife*, 466 F.3d at 739.

We note as a preliminary matter that the parties do not argue mootness; we are independently satisfied that we have jurisdiction, even though Lee abandoned his bid

---

[2] Although the defendants-appellees are the individual members of the Illinois State Board of Elections, for ease of reference we will refer to them collectively as "Illinois."

for the Illinois State Senate before the November 2004 election and that election has been decided. *Storer v. Brown*, 415 U.S. 724, 737 n.8 (1974) ("The . . . election is long over . . . but this case is not moot, since the issues properly presented, and their effects on independent candidacies, will persist as the . . . statutes are applied in future elections. This is, therefore, a case where the controversy is capable of repetition, yet evading review.") (internal quotation marks and citations omitted); *Nader v. Keith*, 385 F.3d 729, 735 (7th Cir. 2004) ("There would be no question of [the candidate's] standing to seek [an injunction placing his name on the ballot] in advance of the submission or even collection of any petitions."); *Tobin for Governor v. Ill. State Bd. of Elections*, 268 F.3d 517, 528-29 (7th Cir. 2001) ("The cases that traditionally have fallen within the 'capable of repetition' exception have involved challenges to the validity of statutory provisions that will continue to operate past the election in question."). The statutes Lee challenges thwarted his bid to appear on the ballot and continue to restrict potential independent candidacies for the Illinois General Assembly. We proceed to the merits of the claim.

The First Amendment, as incorporated against the states by the Fourteenth Amendment, "protects the right of citizens 'to band together in promoting among the electorate candidates who espouse their political views.'" *Clingman v. Beaver*, 544 U.S. 581, 586 (2005) (quoting *Cal. Democratic Party v. Jones*, 530 U.S. 567, 574 (2000)). Accordingly, "the impact of candidate eligibility requirements on voters implicates basic constitutional rights." *Anderson v. Celebrezze*, 460 U.S. 780, 786 (1983). "The exclusion of candidates . . . burdens voters' freedom of association, because an election campaign is an effective platform for the expression of views on the issues of the day, and a candidate serves as a rallying point for like-minded citizens." *Id.* at 787-88. Also, because "voters can assert their

preferences only through candidates or parties or both[,] . . . [t]he right to vote is 'heavily burdened' if that vote may be cast only for major-party candidates at a time when other parties or other candidates are 'clamoring for a place on the ballot.'" *Id.* at 787 (quoting *Lubin v. Panish*, 415 U.S. 709, 716 (1974)).

Ballot access laws thus "place burdens on . . . the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively. Both of these rights, of course, rank among our most precious freedoms." *Williams v. Rhodes*, 393 U.S. 23, 30 (1968). Illinois's filing deadline and signature requirements must be addressed together and their constitutionality determined on the basis of their combined effect on Lee's political association rights as a voter and candidate. *Nader*, 385 F.3d at 735 (citing *Wood v. Meadows*, 207 F.3d 708, 711 (4th Cir. 2000)).

Ballot access restrictions are evaluated under a flexible standard that weighs the "'character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson*, 460 U.S. at 789). "Under this standard, the rigorousness of [the court's] inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights." *Burdick*, 504 U.S. at 434. Restrictions that "severely" burden the exercise of constitutional rights must be "narrowly drawn to advance a state interest of compelling importance." *Id.* (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)). But "reasonable, nondiscriminatory

restrictions" that impose less substantial burdens are generally justified by the state's "important regulatory interests." *Id.*

Whether measured by comparison to the ballot access requirements in the other 49 states or by the stifling effect they have had on independent legislative candidacies since their inception, the combined effect of Illinois's ballot access requirements for independent General Assembly candidates falls on the "severe" end of this sliding scale. The mid-December filing deadline—with the general election still nearly 11 months away—is by far the earliest deadline in the nation. The next earliest filing date is Ohio's; its March 1 deadline falls about two-and-a-half months later than Illinois's and substantially precedes the deadlines set by the great majority of states, 39 of which do not require independents to file until June 1 of the election year or later.

Illinois's signature requirement also exceeds those of all other states. Of the states that require independents to collect signatures equal to a specified percentage of votes cast in the last general election, Illinois is the only state that requires more than 5%. As it applied to Lee during the 2004 election, Illinois's 10% signature requirement even outstrips the demands of the two states (Georgia and South Carolina) that require candidates to collect signatures from 5% of all *registered* voters. When converted to a percentage of registered voters eligible to sign Lee's petition, the Illinois requirement was 5.7%. That represents a 14% increase over Georgia's and South Carolina's 5% require-ments and gives Illinois the distinction of having both the most demanding signature collection requirement *and* by far the earliest filing deadline of all 50 states.

Unsurprisingly, the unrivaled severity of these ballot access restrictions has had the effect of thoroughly exclud-ing independent General Assembly candidates from Illi-

nois's ballots. Three independents did manage to qualify for the ballot during the first election governed by the increased signature requirement. But in the 12 election cycles since 1980, not a single independent legislative candidate has qualified. The Supreme Court has held that ballot access history is an important factor in determining whether restrictions impermissibly burden the freedom of political association: "Past experience will be a helpful, if not always unerring, guide: it will be one thing if independent candidates have qualified with some regularity and quite a different matter if they have not." *Storer*, 415 U.S. at 742. The "inevitable question for judgment" is whether "a reasonably diligent independent candidate [could] be expected to satisfy the signature requirements, or will it be only rarely that the unaffiliated candidate will succeed in getting on the ballot?" *Id.* Not only are unaffiliated legislative candidacies rare in Illinois, in the last 25 years they have been nonexistent.

Because Illinois's ballot access requirements combine to severely burden the rights of candidates and voters to launch and support independent candidacies, they must be "narrowly drawn" to advance a "compelling" state interest. *Burdick*, 504 U.S. at 434; *see also Timmons v. Twin Cities Area New Party*, 520 U.S. 349, 358 (1997). Illinois asserts two primary interests it says are served by its ballot access restrictions: preventing intraparty feuds and excessive factionalism from invading the general election and assuring that candidates whose names appear on the general election ballot have a significant modicum of support.

There is no question that states have a strong interest in confining party infighting to the primary election and reserving the general election for major political struggles. *See Timmons*, 520 U.S. at 367; *Burdick*, 504 U.S. at 439. States also have a strong interest in preventing voter

confusion by limiting ballot access to serious candidates who can demonstrate at least some level of political viability. *See Anderson*, 460 U.S. at 788 n.9; *Jenness v. Fortson*, 403 U.S. 431, 442 (1971). We need not decide whether these interests can be considered "compelling" because Illinois has not demonstrated that its early filing deadline and high signature requirement, taken together, are narrowly drawn to the advancement of these interests.

Illinois devoted much of its brief to arguing that we need not even engage in the foregoing analysis and should reject Lee's challenge—to the filing deadline at least—as a matter of stare decisis based on *Stevenson v. State Board of Elections*, 794 F.2d at 1177. It is true that *Stevenson* rejected a challenge to Illinois's early filing deadline for independents, but that decision does not control the outcome here for at least three reasons. First, the plaintiffs in *Stevenson* challenged only the early filing deadline; they did not ask this court to consider the deadline in conjunction with Illinois's demanding signature requirement and its corresponding rule that disqualifies anyone who signs an independent's nominating petition from voting in the primary. This distinction is important because we are required to evaluate challenged ballot access restrictions together, not individually, and assess their combined effect on voters' and candidates' political association rights. *Nader*, 385 F.3d at 735. An early filing deadline coupled with a less burdensome signature requirement may well pass constitutional muster, depending on their combined effect on political association rights.

Second, as we have noted, the Supreme Court has instructed us to give significant weight to the historical impact of ballot access restrictions. *Storer*, 415 U.S. at 742. Twenty years have passed since *Stevenson*, and in that time not a single independent General Assembly candidate has qualified for the general election ballot. Given the impor-

tance of the historical record to the constitutional equation, two decades of complete exclusion of independents places this case in a markedly different context from that in *Stevenson*.

Finally, and relatedly, we note that this court's opinion in *Stevenson* summarily adopted the district court's reasoning, adding for emphasis that the facts at issue in the case "epitomiz[ed] factionalism and intraparty squabbling. It is exactly this type of chaos that a state may constitutionally regulate in the interest of an orderly and informed electoral process." *Stevenson*, 794 F.2d at 1177. The facts were these: former Illinois Senator Adlai E. Stevenson, the lead plaintiff in *Stevenson*, won his party's nomination for governor in the 1986 primary but then defected from his party's slate and wanted to run as an independent because of his dissatisfaction with the party's nominee for lieutenant governor. *Stevenson v. State Bd. of Elections*, 638 F. Supp. 547, 548-49 (N.D. Ill. 1986). The early filing deadline for independents precluded an independent run and Stevenson sued. The district court rejected his challenge to the early filing deadline on the strength of the state's interest in promoting political stability and discouraging party splintering and unrestrained factionalism. *Id.* at 553. This court summarily affirmed. *Stevenson*, 794 F.2d at 1177.

In contrast to *Stevenson*, the context here carries no baggage of intraparty feuding. Illinois does not suggest that Lee is anything other than a bona fide independent who wants nothing to do with any political party. *Stevenson* is thus distinguishable, for all the foregoing reasons. The very early mid-December filing deadline for independents must be evaluated together with the other ballot access restrictions that apply to independents in Illinois: the 10% signature requirement and the provision that disqualifies any voter who signs an independent's petition from voting in the primary.

We conclude that these ballot access requirements, in combination, severely burden First and Fourteenth Amendment rights and are not narrowly drawn to advance Illinois's interest in avoiding the political instability of party splintering and excessive factionalism and the ballot clutter of frivolous candidacies. We do not question that these are important state interests; they have long been recognized as such. *Timmons*, 520 U.S. at 366-67; *Burdick*, 504 U.S. at 439; *Anderson*, 460 U.S. at 788 n.9; *Storer*, 415 U.S. at 736. But the Supreme Court has also observed that the interest in political stability "does not permit a State to completely insulate the two-party system from minor parties' or independent candidates' competition and influence," *Timmons*, 520 U.S. at 366-67, and that is effectively what Illinois has done.

Illinois maintains that its 10% signature requirement is not a significant burden on independent candidates; its argument in this regard centers on *Jenness*, 403 U.S. at 442. In *Jenness*, the Supreme Court rejected a challenge to Georgia's requirement that independent candidates submit signatures from 5% of registered voters. The Court's holding in *Jenness* was based in part on the absence of any further restrictions on independent candidates in Georgia; the Court specifically noted that although Georgia's 5% requirement was "somewhat higher than the percentage of support required to be shown in many States as a condition for ballot position, . . . this is balanced by the fact that Georgia has imposed no arbitrary restrictions whatever upon the eligibility of any registered voter to sign as many nominating petitions as he wishes." *Id.* (footnote omitted).

Unlike the Georgia statutory scheme approved in *Jenness*, Illinois law does not permit unlimited signing of nominating petitions. *See* 10 ILL. COMP. STAT. 5/7-43 (voters who sign an independent's petition may not vote in the primary election); 10 ILL. COMP. STAT. 5/7-10 (voters may not sign petitions for candidates of more than one party). Disqualify-

ing a voter who signs an independent candidate's nominating petition from voting in the primary election severely burdens the voting and political association rights of the petition signer. Only the most committed supporters of an independent candidate would be willing to sign on condition of primary disenfranchisement, especially so early in the political season.

As we have noted, when Illinois's restrictions on petition signers are taken into account, the signature requirement for Lee in 2004 was 5.7% of eligible registered voters, a 14% increase over the 5% figure approved in *Jenness*. Moreover, we note that Georgia law provided a signature collection period twice as long as Illinois's (180 days) and a filing deadline six months closer to the general election (mid-June). *Jenness*, 403 U.S. at 433-34. These are material differences. If the Court was at its outer limit in approving Georgia's 5% requirement in *Jenness*, then Illinois's more stringent signature requirement and the additional burdens of a shorter collection period and much earlier filing deadline place the Illinois scheme outside any safe harbor *Jenness* might be construed to have created.

In any event, Illinois's assertion that the 10% signature requirement for independents is not burdensome is simply inconsistent with the state's political history. Prior to the enactment of the 10% requirement, independent legislative candidates qualified for the ballot with some regularity. Since 1980, the year following the imposition of the 10% requirement, the combined effect of the state's ballot access restrictions has been to completely eliminate competition from independent legislative candidacies.

Finally, Illinois contends that even if its early filing deadline and hefty signature requirement combine to impose too great a burden on independent candidates, Lee's claim must fail because he could qualify for the ballot by meeting the less onerous requirements for "new party"

candidates. As we have noted, Illinois law allows candidates to form a new political party and appear on the November ballot if they collect signatures from registered voters equal to 5% of the votes cast at the last general election and file those signatures 134 days before the general election. *See* 10 ILL. COMP. STAT. 5/10-2, ¶ 2 (5% signature requirement); 10 ILL. COMP. STAT. 5/10-6 (filing deadline 134 days before general election). Illinois also has a "sore loser" provision—not at issue here—that bars partisan primary losers from entering the general election as newly minted new party candidates. *See* 10 ILL. COMP. STAT. 5/10-2, ¶12.

We disagree that the new party option operates as a sort of constitutional safety valve for independent candidates. It is true that Lee could access the ballot by launching the "David Lee Party," declare his candidacy the party's sole objective, and make an initial appearance on the November ballot without establishing any official party machinery. *See Stevenson*, 794 F.2d at 1179 (Easterbrook, J., concurring). But a sham "party" formed solely for the purpose of a single candidate's election is good for one election only. Illinois law requires that a successful new party candidate must organize his or her party's members and hold a nominating primary contest when the time comes for reelection. *See Vasquez*, 450 N.E.2d at 1381-82. This forces the new party candidate and his or her supporters to associate as a political party even though their true intention is to advance an independent candidacy.

In addition, voters who sign a new party candidate's nominating petitions must declare their intention to form a new political party. 10 ILL. COMP. STAT. 5/10-2. Running under a new party banner thus forces an independent candidate such as Lee to "consider himself a party man, surrendering his independent status," and obliges Lee's supporters to "giv[e] up [their] ties with another party or sacrific[e] [their] own independent status, even though

[their] possible interest in the new party centers around a particular candidate for a particular office." *Storer*, 415 U.S. at 745-46. The Supreme Court has observed that the compelled partisan association inherent in the new party route to ballot access makes it an inadequate substitute for independent candidates: "political party and the independent candidate approaches to political activity are entirely different and neither is a satisfactory substitute for the other." *Id.* at 745. Independent candidates and their supporters are entitled to maintain their independent status; for true independents, the new party option does not provide an acceptable alternative means of accessing the ballot.

Accordingly, we hold that the ballot access restrictions Illinois places on independent General Assembly candidates—the early filing deadline and the 10% signature requirement, together with the corresponding restriction disqualifying an independent candidate's petition signers from voting in the primary—combine to severely burden Lee's First and Fourteenth Amendment rights as a candidate and voter. We also conclude that Illinois has not demonstrated the combined restrictions are narrowly drawn to advance the state's interest in minimizing party splintering, excessive factionalism, and ballot clutter. We do not presume to suggest a new ballot access scheme that will pass constitutional muster; Illinois can make its own judgment about how to remedy its ballot access laws. We leave that task to the political branches of the state government.

The judgment of the district court is REVERSED and the case is REMANDED for entry of judgment for the plaintiff, David Lee.

No. 05-4355                                                        17

A true Copy:

    Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*