In the

# United States Court of Appeals

## For the Seventh Circuit

No. 16-3469

TABITHA TRIPP, *et al.*,

*Plaintiffs-Appellants,*

*v.*

CHARLES W. SCHOLZ, *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Southern District of Illinois.
No. 3:14-cv-890 — **Michael J. Reagan**, *Chief Judge.*

ARGUED SEPTEMBER 18, 2017 — DECIDED OCTOBER 6, 2017

Before FLAUM, BAUER, and SYKES, *Circuit Judges.*

FLAUM, *Circuit Judge.* In 2014, Illinois Green Party members Tabitha Tripp ("Tripp") and Gary Shepherd ("Shepherd") sought to appear on the Illinois general election ballot as candidates for state representative in the 118th and 115th representative districts, respectively. Because the Illinois Election Code deemed the Green Party a "new" political party in both districts, both Tripp and Shepherd were required to ob-

tain nomination petition signatures equaling 5% of the number of voters in the prior regular election for state representative in their district. The Election Code further required that such signatures be collected in the ninety days preceding the nomination petition deadline and that each petition signature sheet be notarized. Neither Tripp nor Shepherd collected a sufficient number of notarized signatures during the ninety-day collection period. As a result, the Illinois State Board of Elections ("ISBE"), which supervises the administration of Illinois's election laws, ruled that neither candidate would appear on the general election ballot.

Following Tripp and Shepherd's ballot disqualification, plaintiffs filed suit in federal court, arguing that Illinois's new party ballot restrictions violated the First and Fourteenth Amendments of the United States Constitution, both facially and as applied to the 118th and 115th districts. Following cross-motions by both parties, the United States District Court for the Southern District of Illinois granted summary judgment in favor of defendants. Plaintiffs now appeal the district court's ruling. For the reasons stated below, we affirm.

## I. Background

Ballot access in Illinois elections, both state and federal, is regulated by the Illinois Election Code. *See generally* 10 Ill. Comp. Stat. §§ 5/1-1–5/30-3. The Election Code divides political parties into two categories: (1) "established" parties; and (2) "new" parties. In the context of state representative elections, an established party is defined as a party that, during the last election for that office, "polled more than 5% of the entire vote cast" in the respective representative district.

*Id.* § 5/10-2.[1] All non-established parties are considered new parties. *See id.*

The Election Code imposes multiple requirements on new parties seeking to place state representative candidates on the general election ballot in a particular representative district. Three such requirements are relevant here. First, the party must obtain petition signatures from at least 5% of the number of voters in the district who voted in the previous regular election for that office (hereinafter the "5% signature requirement"). *Id.* By contrast, an established party must collect only 500 signatures for its candidate to appear on the primary election ballot. *Id.* § 5/8-8. Second, petition signatures must be collected during the "90 days preceding the last day for the filing of the petition" for nomination (hereinafter the "ninety-day petitioning window"). *Id.* § 5/10-4. Finally, nominating petitions must contain a notarized affidavit at the bottom of *each* petition signature sheet in which that sheet's circulator (the individual who obtained the petition signatures) indicates either the dates on which he or she circulated that sheet (or the first and last dates on which the sheet was circulated), or certifies that none of the signatures on the sheet were signed more than ninety days before the last day for the filing of the petition (hereinafter the "notarization requirement"). *Id.* The circulator's affidavit must also certify that each signature on that sheet was signed in the circulator's presence, is genuine,

---

[1] A party may also qualify as established as to the entire state and "any district or political subdivision thereof" if, at the last general election for state and county officers, its candidate for Governor polled "more than 5% of the entire vote cast for Governor." 10 Ill. Comp. Stat. § 5/10-2. This qualification mechanism, however, does not apply here.

and, to the best of the circulator's knowledge and belief, is from a "duly registered voter[]" of the relevant district. *Id.* The ninety-day petitioning window and notarization requirement apply to candidates of both new *and* established parties. *Compare id.* § 5/8-8, *with id.* § 5/10-4.

New parties that fail to satisfy these requirements may have their candidates disqualified from appearing on the ballot. Voters, however, may still cast write-in votes for the candidates on election day.

The 118th representative district (in which Tripp sought to appear on the general election ballot) is located in the southeast corner of the state. Covering approximately 2,808 square miles, the district stretches from the southernmost counties of Illinois—Alexander, Pulaski, and Massac—to the northern boundary of Hamilton County. It bisects Jackson County in the west and extends to the Indiana border in the east. The 115th representative district (in which Shepherd sought to appear) is located northwest of the 118th district. It covers approximately 1,810 square miles, from the southwest corner of Union County on the Mississippi River to the northern edge of Jefferson County. By contrast, sixteen other Illinois representative districts extend less than ten square miles, while seventy-three districts cover less than 100 square miles.

Before the 2010 census, boundaries for the 118th and 115th districts generally followed county lines. In 2011, however, the State of Illinois redrew many of its representative district boundaries, including those of the 118th and 115th. This redistricting split the City of Carbondale, which previously fell

entirely in the 115th district, across the 115th and 118th districts.[2]

In 2014, Tripp and Shepherd, both members of the Illinois Green Party, sought to appear on the upcoming Illinois general election ballot as Green Party candidates for state representative in Illinois's 118th and 115th representative districts, respectively. At the time, the Illinois Green Party was considered a new party in both districts. Consequently, Tripp and Shepherd were required to satisfy the Illinois Election Code's new party nomination requirements, including the 5% signature requirement, ninety-day petitioning window, and notarization requirement.

The ninety-day petitioning window ran from March 25 to June 23, 2014. To satisfy the 5% signature requirement, Tripp needed to obtain at least 2,399 petition signatures; Shepherd needed to obtain at least 2,407. By the filing petition deadline, however, Tripp had amassed only approximately 1,700 signatures, gathered by 34 circulators on 199 notarized petition sheets. Shepherd's 30 circulators fared only slightly better, obtaining approximately 1,800 signatures on 205 notarized sheets. Due to Tripp and Shepherd's signature shortfalls, the

---

[2] There is a factual dispute amongst the parties regarding the effects of Illinois's 2011 redistricting on other population centers. Plaintiffs contend, for example, that population centers that were previously located entirely in either the 118th or 115th district, such as Anna and McLeansboro, now fall across district boundaries. Defendants, on the other hand, maintain that Anna and McLeansboro remain entirely within the 118th district. As discussed *infra*, however, the outcome of this factual dispute is immaterial to the Court's ultimate analysis.

ISBE ruled that neither candidate would appear on the general election ballot in their respective districts.

Following Tripp and Shepherd's disqualification, the 2014 general election ballot for the 118th representative district included the name of only one candidate for state representative (a result that also occurred in 2010 and 2012). The ballot for the 115th district included the names of two candidates (although only one candidate appeared in 2012). Tripp and Shepherd ultimately received 67 and 106 write-in votes respectively, but neither were elected to office.

In August 2014, Tripp, Shepherd, the Illinois Green Party, and certain of its prospective voters (collectively, "plaintiffs") filed a complaint in the United States District Court for the Southern District of Illinois against a number of ISBE officials. Plaintiffs originally sought a preliminary injunction requiring Tripp and Shepherd to be placed on the general election ballot, as well as permanent injunctive relief regarding Illinois's new party ballot access restrictions. Plaintiffs asserted that the Election Code's 5% signature requirement and notarization requirement violated the Free Speech and Association Clauses of the First Amendment and the Equal Protection Clause of the Fourteenth Amendment, both facially and as applied to the 118th and 115th districts. Plaintiffs further challenged the constitutionality of the signature and notarization requirements when considered in conjunction with the ninety-day petitioning window and geographical challenges presented by the 118th and 115th districts following Illinois's 2011 redistricting.

In September 2014, the district court denied plaintiffs' motion for a preliminary injunction, ruling that the 2014 general election would go forward without Tripp and Shepherd on

their respective ballots. Subsequently, upon the close of discovery, both parties filed cross-motions for summary judgment. On August 17, 2016, the district court granted defendants' motion, denied plaintiffs' cross-motion, and entered judgment in favor of defendants. This appeal followed.

## II. Discussion

We review a district court's grant of summary judgment de novo. *C.G. Schmidt, Inc. v. Permasteelisa N. Am.*, 825 F.3d 801, 805 (7th Cir. 2016). Summary judgment is appropriate if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014) (quoting Fed. R. Civ. P. 56(a)). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where, as here, the parties file cross-motions for summary judgment, all reasonable inferences are drawn in favor of the party against whom the motion at issue was made. *Dunnet Bay Constr. Co. v. Borggren*, 799 F.3d 676, 688 (7th Cir. 2015).

### A. The Relevant Constitutional Framework

"It is well-settled that '[t]he impact of candidate eligibility requirements on voters implicates basic constitutional rights' to associate politically with like-minded voters and to cast a meaningful vote." *Stone v. Bd. of Election Comm'rs for City of Chi.*, 750 F.3d 678, 681 (7th Cir. 2014) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 786 (1983)); *see also Norman v. Cook Cty. Officers Electoral Bd.*, 502 U.S. 279, 288 (1992) (footnote omitted) ("The right [to create and develop new political parties]

derives from the First and Fourteenth Amendments and advances the constitutional interest of like-minded voters to gather in pursuit of common political ends, thus enlarging the opportunities of all voters to express their own political preferences."); *Munro v. Socialist Workers Party*, 479 U.S. 189, 193 (1986) ("Restrictions upon the access of political parties to the ballot impinge upon the rights of individuals to associate for political purposes, as well as the rights of qualified voters to cast their votes effectively."); *Ill. St. Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979); *Libertarian Party of Ill. v. Scholz*, No. 16-1667, 2017 WL 4216239, at *1 (7th Cir. Sept. 22, 2017) ("The core of the fundamental right to political association is the right to band together in a political party to advance a policy agenda by electing the party's members to office. That necessarily includes the party's right to access the ballot and its candidates' right to appear on the ballot under the party banner."); *Nader v. Keith*, 385 F.3d 729, 737 (7th Cir. 2004) ("[T]he right to stand for office is to some extent derivative from the right of the people to express their opinions by voting."). These rights apply equally to third parties, which have played a "significant role … in the political development of the Nation." *Ill. St. Bd. of Elections*, 440 U.S. at 185; *see also Nader*, 385 F.3d at 732 ("[T]hird parties … have made significant contributions to political competition, whether by injecting new ideas or … by actually displacing one of the major parties.").

Such rights, however, "are not absolute," *Libertarian Party of Ill. v. Rednour*, 108 F.3d 768, 773 (7th Cir. 1997), as the Constitution also confers upon the states "broad authority to regulate the conduct of elections." *Griffin v. Roupas*, 385 F.3d 1128, 1130 (7th Cir. 2004). Specifically, it grants states "broad power

to prescribe the 'Times, Places, and Manner of holding Elections for Senators and Representatives,' which power is matched by state control over the election process for state offices." *Tashijan v. Republican Party of Conn.*, 479 U.S. 208, 217 (1986) (quoting U.S. Const. art. I, § 4, cl. 1); *see also Wash. St. Grange v. Wash. St. Republican Party*, 552 U.S. 442, 451 (2008).

The Supreme Court has further opined that, in addition to constitutional law, "[c]ommon sense … compels the conclusion that government must play an active role in structuring elections." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992); *see also Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) ("States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder."). "[A]s a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Storer v. Brown*, 415 U.S. 724, 730 (1974); *see also Griffin*, 385 F.3d at 1130 ("[A]n unregulated election system would be chaos …."). As a result, states enjoy "considerable leeway" with respect to election procedures. *Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182, 191 (1999).

In short, state ballot access laws seek to balance these state interests with "the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively." *Rednour*, 108 F.3d at 773 (quoting *Williams v. Rhodes*, 339 U.S. 23, 30 (1968)); *see also Perez-Guzman v. Gracia*, 346 F.3d 229, 239 (1st Cir. 2003) ("[A] fine line separates permissible regulation of state election processes from impermissible abridgement of First Amendment rights. Plotting that

line calls for a careful reconciliation of competing centrifugal and centripetal forces."). Due to this quest for equilibrium, "not all restrictions ... on candidates' eligibility for the ballot impose constitutionally-suspect burdens," *Anderson*, 460 U.S. at 788, and "the mere fact that a State's system 'creates barriers ... tending to limit the field of candidates from which voters might choose ... does not of itself compel close scrutiny.'" *Burdick*, 504 U.S. at 433 (quoting *Bullock v. Carter*, 405 U.S. 134, 143 (1972)). Indeed, there is "no 'litmus-paper test' to 'separate valid from invalid restrictions.'" *Stone*, 750 F.3d at 681 (quoting *Anderson*, 460 U.S. at 789). Rather, the Court applies "a more flexible standard," *Burdick*, 504 U.S. at 434, that makes "a practical assessment of the challenged scheme's justifications and effects." *Stone*, 750 F.3d at 681. Specifically, the Court

> must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.

*Anderson*, 460 U.S. at 789; *see also Griffin*, 385 F.3d at 1130 ("[T]he constitutional question is whether the restriction and resulting exclusion are reasonable given the interest the restriction serves.").

"Practically speaking, much of the action takes place at the first stage of *Anderson*'s balancing inquiry. If the burden on the plaintiffs' constitutional rights is 'severe,' a state's regulation must be narrowly drawn to advance a compelling state interest." *Stone*, 750 F.3d at 681 (quoting *Burdick*, 504 U.S. at 434). On the other hand, "[i]f the burden is merely 'reasonable' and 'nondiscriminatory,'" then "the government's legitimate regulatory interests will generally carry the day." *Id.* (quoting *Burdick*, 504 U.S. at 434); *see also Libertarian Party of Ill.*, 2017 WL 4216239, at *3 ("[T]he level of scrutiny depends on the regulation at issue: the more severely it burdens constitutional rights, the more rigorous the inquiry into its justifications."); *Krislov v. Rednour*, 226 F.3d 851, 859 (7th Cir. 2000) ("Laws imposing severe burdens must be narrowly tailored to serve compelling state interests, but lesser burdens receive less exacting scrutiny.").

As with the evaluation of ballot regulations as a whole, there is no "litmus test for measuring the severity of a burden that a state law imposes." *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 191 (2008). Regardless of how "slight that burden may appear," however, "it must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" *Id.* (quoting *Norman*, 502 U.S. at 288–89).

### B. The Illinois Election Code's 5% signature requirement, standing alone, does not violate the First or Fourteenth Amendment

With these principles in mind, we may now turn to the specific ballot regulations at issue. Despite plaintiffs' arguments to the contrary, the 5% signature requirement, standing alone, does not impose a severe burden on plaintiffs' constitutional rights. On multiple occasions, the Supreme Court has upheld signature requirements equaling 5% of the eligible voting base. *See Norman*, 502 U.S. at 282 n.2, 295 (upholding Illinois election provision requiring certain candidates to obtain the lesser of 5% of the vote or 25,000 petition signatures); *Am. Party of Tex. v. White*, 415 U.S. 767, 789 (1974) ("Demanding signatures equal in number to 3% or 5% of the vote in the last election is not invalid on its face …."); *Jenness v. Fortson*, 403 U.S. 431, 438 (1971) ("[W]e cannot say that Georgia's 5% petition requirement violates the Constitution."). In light of this precedent, this Court has rejected prior arguments that a 5% signature requirement is "severe on its face." *See Rednour*, 108 F.3d at 775.

Plaintiffs invoke this Court's prior characterization of the 5% signature requirement in *Jenness* as establishing the "outer limit" of constitutional validity. *See Lee v. Keith*, 463 F.3d 763, 769 (7th Cir. 2006) (observing that *Jenness* sets something of an "outer limit" for signature requirements). The 5% requirement in *Jenness*, however, applied to all *registered* voters, a group much larger than *actual* voters, the relevant population here. *Compare Jenness*, 403 U.S. at 432 (addressing the constitutionality of Georgia law that required "nominating petition signed by at least 5% of the number of registered voters at the last general election for the office in question"), *with* 10 Ill.

Comp. Stat. § 5/10-2 (requiring signatures from at least "5% of the number of voters who voted at the next preceding regular election"). Thus, this case treads further from the constitutional ledge than plaintiffs portray.

Of course, sheer percentages only go so far. *See Hall v. Simcox*, 766 F.2d 1171, 1174 (7th Cir. 1985) ("Granted, numbers aren't everything."). "What is ultimately important is not the absolute or relative number of signatures required but whether a 'reasonably diligent candidate could be expected to be able to meet the requirements and gain a place on the ballot.'" *Stone*, 750 F.3d at 682 (quoting *Bowe v. Bd. of Election Comm'rs of City of Chi.*, 614 F.2d 1147, 1152 (7th Cir. 1980)). Here, that answer is yes. "[B]allot access history is an important factor in determining whether restrictions impermissibly burden the freedom of political association …." *Lee*, 463 F.3d at 769. It is notable, therefore, that Illinois third party political candidates have successfully petitioned at least 5% of the vote in multiple districts across multiple elections. In 2002, for example, a Green Party candidate for state representative successfully petitioned to appear on the general election ballot in the 115th district. In 2012, the Green Party fielded candidates in both the 5th and 12th congressional districts, and an independent candidate successfully petitioned in the 13th congressional district. This serves as "powerful evidence" that the burden of satisfying the 5% signature requirement is not severe. *See Stone*, 750 F.3d at 683.

In both their brief and reply, plaintiffs point to the fact that the numerical signature requirement for candidates from established parties is "far less" than that required for new parties. Appellant Br. 17; Appellant Reply 6 ("[T]he two Plaintiff Green Party candidates each submitted about 3.5 times more

signatures for the General Election ballot … than an established party candidate needs to submit to get on the Primary Election ballot."). As this Court has stated previously, however, "comparing the petitioning requirements for an 'established' party's candidate in a primary election and a 'new' party's candidate in a general election" is to "compare apples with oranges." *Rednour*, 108 F.3d at 776.

> Unlike an established party … a new party has not yet demonstrated a significant modicum of support. The established party has already jumped the hurdle of demonstrating its public support by receiving 5% of the vote in the last [relevant] election. Thus, it is neither irrational nor unfair to require a candidate from a new party to obtain a greater percentage of petition signatures to appear on the general election ballot than a candidate from an established party for the primary election ballot. The two petitioning requirements contain different percentages because they are used at two different times for two different purposes.

*Id.* Plaintiffs' argument, therefore, is unavailing.

Because the 5% signature requirement, standing alone, is not severe, the Court "need only determine whether Illinois has important interests that sufficiently justify the burden on [plaintiffs'] rights." *Id.* at 775. On this score,

> [t]here is surely an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on

> the ballot—the interest, if no other, in avoiding confusion, deception, and even frustration of the democratic process at the general election.

*Munro*, 479 U.S. at 193–94 (quoting *Jenness*, 403 U.S. at 442); *see also Stone*, 750 F.3d at 685; *Navarro v. Neal*, 716 F.3d 425, 431 (7th Cir. 2013); *Rednour*, 108 F.3d at 775.

Plaintiffs challenge the legitimacy of the state's interest "because there has been no showing that Illinois state representative elections have a history of ballot clutter." Appellant Br. 16–17. To the contrary, according to plaintiffs, recent elections in both the 118th and 115th districts have shown "a dearth of candidates." *Id.* at 16.[3] The Supreme Court, however, has "never required a State to make a particularized showing of the existence of voter confusion, ballot overcrowding, or the presence of frivolous candidacies prior to the imposition of reasonable restrictions on ballot access." *Munro*, 479 U.S. at 194–95. "If courts were to require that government defendants marshal evidence to prove actual voter confusion, such a requirement would 'necessitate that a State's political system sustain some level of damage before the legislature could take correct action.'" *Navarro*, 716 F.3d at 432 (quoting *Munro*, 479 U.S. at 195). The Court has instead endorsed a policy that permits state legislatures "to respond to potential deficiencies in the electoral process with foresight rather than reactively." *Munro*, 479 U.S. at 195. Thus, the mere "specula-

---

[3] Plaintiffs allege that, over the five previous general elections, the average number of state representative candidates on the ballot in the 118th district was 1.5, while the average number of state representative candidates on the ballot in the 115th district was 2.25.

tive concern that altering the challenged signature require-
ment would lead to a large number of frivolous candidates
qualifying for the ballot and, consequently, voter confusion is
sufficient." *Navarro*, 716 F.3d at 432. Plaintiffs' argument ac-
cordingly fails.

In sum, Illinois's 5% signature requirement, standing
alone, does not violate the First or Fourteenth Amendment.

### C. The Illinois Election Code's notarization require-ment, standing alone, does not violate the First Amendment

Illinois's notarization requirement, standing alone, also
does not impose a severe burden on plaintiffs' constitutional
rights.[4] Plaintiffs argue that notarizing petition sheets "[are]

---

[4] Plaintiffs' position on this particular issue is unclear. On the one
hand, they state that they "do not take the position that the notarization
requirement, of itself, imposes an unconstitutional burden on their right
to free speech and association, and to equal protection under the law."
Appellant Br. 26; *see also* Appellant Reply 9 ("[W]hile the notarization re-
quirement … imposes a substantial barrier upon minority-party candi-
dates and does not materially support the state's interest in avoiding bal-
lot confusion and overcrowding, this barrier, *of itself*, does not rise to the
level of being unconstitutional. Rather, it is the *totality or combined impact*
of several such burdens, the notarization requirement included, that ren-
ders the overall ballot … access regime in Illinois unconstitutional.") (em-
phasis added) (citations omitted). At the same time, their statement of the
issues presented on appeal includes, "II. Is the State's notarization require-
ment for new political party nomination papers an unreasonable burden
on ballot access?" Appellant Br. 1. Plaintiffs list this issue separate and
apart from, "III. Is the cumulative effect of the State's ballot access require-
ments for new parties an unconstitutional burden on Plaintiffs' rights?"
*Id.* Moreover, plaintiffs state that Issue II on appeal corresponds to Count
I of their Amended Complaint, which presents a stand-alone challenge to

an extra step" to the nomination process requiring "additional time and effort" that "could have been spent collecting signatures." Appellant Br. 5–6. Additionally, plaintiffs claim that, because of the notarization requirement, some individuals refused to circulate petitions in the first place. *Id.* at 5.

The Supreme Court has previously upheld a notarization requirement in another state, although admittedly, the Court did not assess the condition in depth. In *American Party of Texas v. White*, the Texas Election Code required candidates of parties that either polled less than 2% of the total gubernatorial vote in the preceding general election or did not nominate a candidate for governor to pursue ballot qualification via precinct nominating conventions. 415 U.S. at 774. These nominating conventions required participation from at least 1% of the total vote cast for governor at the last preceding election (in 1972, this number equaled approximately 22,000 electors). *Id.* at 776. If the party did not obtain the requisite 1% convention participation, supplemental petitions could be circulated for signature to make up the difference. *Id.* The Election Code, however, mandated that *each* petition signatory be administered and sign an oath that he or she was a qualified voter and had not participated in any other party's nominating or qualification proceedings. *Id.* The Election Code further mandated that the oath be notarized. *Id.*

A group of minority political parties, their candidates, and supporting voters contested this and other aspects of Texas' election scheme. *Id*. at 770. Rejecting the challenge, the District

the notarization requirement. Given the ambiguity, and in the interest of completeness, the Court addresses the issue.

Court for the Western District of Texas noted that the nota-
rization requirement served "a compelling interest to insure
that participants in one party's nominating process do not
participate in another's." *Raza Unida Party v. Bullock*, 349 F.
Supp. 1272, 1280 (W.D. Tex. 1972), *aff'd in part, vacated in part
sub nom. Am. Party of Tex.*, 415 U.S. 767 (1974). The district
court further stated that there was "apparently no workable
alternative … if the state is to be able to enforce its criminal
penalties against cross-over voting and apprize the voters of
these possible penalties." *Id.* "Given the state's interest in in-
suring that different candidates for the same office are sup-
ported by different voters," the court upheld the notarization
requirement "for want of a feasible alternative." *Id.*

On appeal, the Supreme Court stated that it was "in no
position to disagree," noting that the plaintiffs made "little or
no effort" to demonstrate the notarization requirement's im-
practicability "or that it [was] unusually burdensome." *Am.
Party of Tex.*, 415 U.S. at 787; *see also Howlette v. City of Rich-
mond, Va.*, 580 F.2d 704, 705 (4th Cir. 1978) (per curiam) (up-
holding constitutionality of provision of the charter of the
City of Richmond requiring each signature of a qualified
voter on a petition for a referendum to be verified before a
notary).

More recently, at least one circuit court of appeals has dis-
tinguished *American Party of Texas* and struck down a nota-
rization requirement. *See Perez-Guzman*, 346 F.3d 229. In *Perez-
Guzman*, Puerto Rican organizations seeking recognition as
political parties were required to gather approximately
100,000 endorsing petitions, each signed by a registered voter
and sworn to before a notary public. *Id*. at 230. In Puerto Rico,
however, only lawyers could become notaries, and there were

fewer than 8,000 notaries in the entire commonwealth. *Id.* Moreover, notarial services did "not come cheap"; the district court found that notarizing 100,000 signatures cost at least $1,500,000. *Id.* at 230, 233.

On appeal, the First Circuit noted that the rule that *each signature* be separately notarized "limit[ed] the efficacy of petition circulators" since the circulators could not "seal the deal then and there." *Id.* at 239. Rather, the "final exchange in the interactive communication—the voter's official endorsement of the fledgling party—[could not] occur unless and until a notary [was] present." *Id.* This "triangulation" meant that "either the voter must visit the notary's office or the notary must take to the field." *Id.* at 239–40.

The court further recognized that this restriction was "aggravated" because the limitation of notarial status to licensed attorneys "erecte[d] a high barrier to entry and virtually ensure[d] that the supply of notaries [would] remain inelastic." *Id.* at 240. Given the number of lawyers in the commonwealth, "the ratio of notaries to voters [was] quite small." *Id.* This "short supply," further combined with the high financial cost for notarization, made the task of registering a new political party "one of daunting proportions." *Id.* The court held, therefore, that the lawyer-notarization requirement imposed a severe restriction on ballot access. *Id.*

Here, plaintiffs acknowledge that the restrictions found in *Perez-Guzman* presented "obstacles more burdensome" than those faced here. Appellant Br. 20. Nevertheless, they maintain that the hardship imposed by Illinois's notarization requirement remains substantial. As the district court noted, however, "a number of mitigating circumstances" place Illinois's notarization requirement below the "severe" end of the

burden spectrum. *See Tripp v. Smart*, No. 3:14-cv-890, 2016 WL 4379876, at *5 (S.D. Ill. Aug. 17, 2016). First, unlike the restriction in *Perez-Guzman*, which required that *each signature* be separately notarized, here, the Illinois Election Code only mandates notarization of the circulator's verification on each petition *sheet*. This distinction, which eliminates the "triangulation" effect criticized by the First Circuit, *see Perez-Guzman*, 346 F.3d at 239, is far from *de minimis*. The ISBE's standardized petition form (SBE No. P-8) provides for ten signatures per page, which, if permitted in *Perez-Guzman*, would have reduced Puerto Rico's notarization requirement by 90%.

Additionally, the ISBE's standardized form may be modified, and the Illinois Election Code does not explicitly limit the number of signatures per petition page. This freedom, of course, has practical limits; as plaintiffs point out, each petition sheet must allow enough space for each voter to provide an identifiable signature and address, as well as room for the name of the candidate, the circulator's name and address, the circulator's verification, and the notary's seal and signature. Nonetheless, plaintiffs concede that, even with these restrictions, each petition form reasonably allows for "as many as 20 signatures per page." Appellant Br. 21.[5] This would have reduced the notarization requirement demanded in *Perez-Guzman* by 95%. Applied here, Tripp and Shepherd each required as few as 120 and 121 notarized petition sheets, respectively. This is a far cry from the notarizations demanded in *Perez-Guzman*.

---

[5] In fact, the Libertarian Party utilized petition signature sheets containing twenty signatures during the 2014 election.

Also unlike *Perez-Guzman*, there are no major limitations on who can become a notary in Illinois, and the time and expense necessary "is not extreme." *Tripp*, 2016 WL 4379876, at *5. An applicant

> must be citizen of the United States or an alien lawfully admitted for permanent residence, be a resident of the State of Illinois for at least 30 days, be at least 18 years of age, be able to read and write the English language, have not been convicted of a felony, and have not had a notary commission revoked during the past 10 years. An applicant must complete the application form provided by the Secretary of State and must obtain a notary bond valued at $5,000 from a bonding or surety company.

*Notary Services Index*, Office of the Ill. Sec'y of St., http://www.cyberdriveillinois.com/departments/index/notary/home.html (last visited Oct. 6, 2017); *see also* 5 Ill. Comp. Stat. § 312/2-102. Indeed, the Illinois Green Party Chairman was himself a notary, and the Green Party threw multiple "notarization gatherings" during the 2014 election cycle to assist circulators in the notarization process.

Finally, again in contrast to *Perez-Guzman*, the parties here both acknowledge that the 118th and 115th districts each contain a population center (Carbondale) that offers free notary services.

In sum, although Illinois's notarization requirement certainly imposes some logistical burden on plaintiffs' ballot access rights, it cannot be fairly characterized as "severe." Thus,

the requirement need only "be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" *Crawford*, 553 U.S. at 191 (quoting *Norman*, 502 U.S. at 288–89). Although the district court acknowledged that this presents "a closer question" than the 5% signature requirement, it correctly deemed that the notarization requirement was supported by a "legitimate need" to protect the integrity of the electoral process. *Tripp*, 2016 WL 4379876, at *7; *see also Welch v. Johnson*, 588 N.E.2d 1119, 1126 (Ill. 1992) ("[T]he provisions of the Election Code are designed to protect the integrity of the electoral process.").

This Court has previously noted that Illinois is a state "notorious for election fraud." *Nader*, 385 F.3d at 733; *Griffin*, 385 F.3d at 1130–31 ("Voting fraud is a serious problem in U.S. elections generally and one with a particularly gamey history in Illinois …."). Notarization ensures that circulators can be easily identified, questioned, and potentially prosecuted for perjury. *See Sakonyi v. Lindsey*, 634 N.E.2d 444, 447 (Ill. App. Ct. 1994) ("It is assumed by her sworn statement that the circulator is subjecting herself to possible perjury prosecution. Thus, the circulator's affidavit requirement is considered a meaningful and realistic method of eliminating fraudulent signatures and protecting the integrity of the political process."). As the district court noted, "[t]he need to prosecute election fraud is a legitimate interest." *Tripp*, 2016 WL 4379876, at *7; *see also Buckley*, 525 U.S. at 196 (recognizing the state's "strong interest in policing lawbreakers among petition circulators").

Plaintiffs contend that lesser restrictions could equally combat circulator fraud. Plaintiffs, for example, propose that

circulators sign *non*-notarized verifications, like those permitted under the Illinois Code of Civil Procedure. *See* 735 Ill. Comp. Stat. § 5/1-109 (allowing verification under penalty of perjury to serve as an acceptable substitute whenever the Code of Civil Procedure requires a document to be "sworn to or verified under oath"). The district court rejected this proposal, finding that such verifications could still be submitted "without pain of an identification check, and thus provide less of a chance for law enforcement authorities to trace down the true origin of fraud." *Tripp*, 2016 WL 4379876, at *7. Plaintiffs also recommend allowing circulators to submit one notarized verification for *all* of their petition sheets rather than mandating a notarized affidavit at the bottom of *each* signature page. The district court shunned this proposal as well since "there would be no assurance" that sheets lacking individual notarization were not inserted "after the fact." *Id.*

Ultimately, this Court need not enter the policy fray. Because the notarization requirement does not impose a severe burden, it need not be narrowly tailored. *Krislov*, 226 F.3d at 859. Although "courts may sometimes talk the language of least drastic means[,] … they only strike down [non-severe] ballot-access regulations that are unreasonable." *Hall*, 766 F.2d at 1174. "Of course the existence of a less restrictive alternative may be relevant to an assessment of reasonableness; one way in which a requirement may be unreasonable is that it is unnecessary in light of another requirement that could be imposed instead." *Id.* Nevertheless, as stated below, this case does not present "the kind of far-afield restriction that … suggest[s] that Illinois is behaving unreasonably in dealing with the problem of circulator fraud." *Tripp*, 2016 WL 4379876, at *8.

**D. The Illinois Election Code's signature and notariza-
tion requirements, even when considered in conjunc-
tion with the ninety-day petitioning window and ge-
ographic layouts of the 118th and 115th districts, do
not violate the First or Fourteenth Amendment**

Finally, plaintiffs argue that the 5% signature requirement,
notarization requirement, ninety-day petitioning window,
and 2011 redistricting of the 118th and 115th district bounda-
ries, *when considered cumulatively*, create an unconstitutional
legislative scheme. To be sure, "[r]estrictions on candidacy
must … be considered together rather than separately,"
*Nader*, 385 F.3d at 735, and a regulatory scheme "must be con-
sidered in its entirety." *Hall*, 766 F.2d at 1174.

The addition of the ninety-day petitioning window and
geographic layout of the districts at issue, however, does not
dramatically tilt the constitutional scales. Regarding the for-
mer, Tripp was required to obtain 2,399 petition signatures in
order to appear on the ballot; Shepherd, 2,407 signatures.
Spread over the ninety-day petitioning window, each candi-
date needed to obtain only twenty-seven signatures a day. In
her attempt to reach the signature goal, Tripp employed
thirty-four separate circulators; Shepherd utilized thirty. If
one divides the signature requirement for each candidate
evenly across circulators, then each of Tripp's circulators was
responsible for obtaining only seventy-one signatures during
the mandated time period; Shepherd's circulators each re-
quired eighty-one. This means that, spread across the ninety-
day petitioning window, Tripp and Shepherd's circulators
each needed to average less than one signature per day in or-
der to meet their required thresholds. Even in the rural set-
tings of the 118th and 115th districts, such a burden cannot be

deemed severe. *See Crawford*, 553 U.S. at 205 (Scalia, J., concurring) ("Ordinary and widespread burdens, such as those requiring 'nominal effort' of everyone, are not severe."). Indeed, both this Court and the Supreme Court have found more onerous signature timelines permissible. *See, e.g., Am. Party of Tex.*, 415 U.S. at 786–87 (fifty-five days to collect 22,000 signatures); *Stone*, 750 F.3d at 684 (ninety days to collect 12,500 signatures); *Nader*, 385 F.3d at 736 (ninety days to collect 25,000 signatures).

The impact of the ninety-day petitioning window on the notarization requirement is even less pronounced. Although each circulator must notarize each of their petition signature sheets, nothing prevents a circulator from notarizing all of their sheets at the same time, before the same notary. Given the scope of Illinois's notarial regulatory scheme, this can be reasonably accomplished within the confines of the petitioning window.

Regarding the layout of the 118th and 115th districts, plaintiffs focus heavily upon their "extraordinarily large" geographic size. Appellant Br. 17. The distance covered by the districts, they argue, renders the state's ballot access restrictions overly burdensome. Plaintiffs' emphasis on mere mileage, however, is misplaced. For one, plaintiffs overstate the relative size of the districts at issue. The 118th and 115th districts are not even the largest in Illinois (they rank fifth and twelfth, respectively), and they pale in comparison to representative districts found in other parts of the United States.

The 118th and 115th districts cover approximately 2,808 and 1,810 square miles, with population densities of 38.72 and 60.07 people per square mile, respectively. *See State Legislative Districts by Urban/Rural Population and Land Area*, U.S. Census

Bureau,                                https://www.census.gov/geo/maps-
data/data/sld_state.html (last visited Oct. 6, 2017). In contrast,
South Dakota's 27th representative district measures 8,076
square miles, with a population density of 2.79. *Id.* Utah's 73rd
representative district covers 21,463 square miles (over seven
and a half times the size of the 118th district and nearly twelve
times the size of the 115th), with a population density of only
1.72 (95.56% smaller than the 118th district and 97.14%
smaller than the 115th). *Id.*

Moreover, "[t]he length of time it takes to cover [distance]
depends on road and traffic conditions that vary dramatically
across the state." *Griffin*, 385 F.3d at 1132. The time needed to
traverse Illinois's 7.76 square mile 26th district—which in-
cludes much of traffic-heavy Chicago—as opposed to the ru-
ral 118th or 115th districts, therefore, is not as stark as plain-
tiffs portend.

Nor are plaintiffs unfairly hindered by the 2011 redistrict-
ing of population centers across district boundaries.[6] For one,
even after redistricting, both the 118th and 115th districts
boast population centers that far exceed the number of re-
quired petition signatures. Harrisburg, for example, still falls
entirely within the 118th district and contains approximately
9,000 residents, more than three and a half times the number

---

[6] Plaintiffs make a cursory claim that the new district boundaries were
drawn with the specific intent to dilute the influence of third parties. *See*
Appellant Br. 17 ("[A] reasonable inference can and should be drawn that
at least some of this was intentional on the part of the legislature when it
redrew district boundaries in 2010."). The thrust of plaintiffs' complaint,
however, involves ballot access, not political gerrymandering. Plaintiffs'
assertions of the latter are both underdeveloped in their pleadings and
wholly unsupported by the record.

of petition signatures Tripp was required to obtain. *See 2010 Census Interactive Population Search*, U.S. Census Bureau, https://www.census.gov/2010census/popmap/ipmtext.php (last visited Oct. 6, 2017). Similarly, Murphysboro falls entirely in the 115th district and contains approximately 7,970 residents, almost three and a quarter times the number of petition signatures Shepherd was required to obtain. *See id.* This says nothing of Carbondale and its 25,902 residents that fall partially into both districts. *See id.*

Finally, plaintiffs contest that the division of population centers "caused confusion among registered voters in those areas" as to their proper district, thus necessitating additional time to ascertain eligible petition signatories. Appellant Br. 17. However, such confusion—which impacts *all* political parties and generally follows *every* redistricting that results from the decennial census—is a necessary side effect of an electoral scheme that must evolve to fit the ever-changing footprint of the nation's citizenry. It does not, therefore, form the basis of a viable constitutional challenge.[7]

### III. Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court.

---

[7] As a final aside, plaintiffs claim that their signature-gathering efforts were hindered by "double-petitioning," where circulators presented voters with both the Illinois Green Party's nominating petitions for statewide *and* local candidates. Plaintiffs assert that, as a result, circulators were required to spend more time with each potential signatory, and that some signatories did not have time to sign both petitions. Such negative consequences, however, are the result of the Green Party's own campaign practices, not Illinois's ballot access scheme. They accordingly have no bearing on the Court's constitutional analysis.