In the

# United States Court of Appeals

## For the Seventh Circuit

No. 19-1125

DAVID M. GILL, *et al.*,

*Plaintiffs-Appellants*,

*v.*

CHARLES W. SCHOLZ, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Central District of Illinois.
No. 3:16-cv-03221 — **Colin S. Bruce**, *Judge*.

ARGUED JANUARY 7, 2020 — DECIDED JUNE 18, 2020

Before BRENNAN, SCUDDER, and ST. EVE, *Circuit Judges*.

BRENNAN, *Circuit Judge*. In August 2015 David Gill launched his fifth congressional campaign. Unlike his past campaigns, Gill ran as an independent. Although Gill needed 10,754 signatures to qualify for the general ballot, he came up 2,000 short, so the Illinois State Officers Electoral Board ("SOEB") did not permit him to appear on the general ballot for Illinois's 13th Congressional District. Gill filed suit, claiming violations of the First and Fourteenth Amendments.

The district court, relying on this court's case law, granted a motion for summary judgment filed by the Illinois State Board of Elections ("ISBE") and the SOEB. Because the district court failed to conduct a fact-based inquiry as mandated by the Supreme Court, we reverse and remand.

## I. Background

Candidates seeking to run for Congress must clear three hurdles under the Illinois Election Code. By clearing these hurdles, independent and third-party candidates qualify to run in the general election, and candidates from established parties qualify to run in primary elections.[1] If a candidate from an established party wins a primary election, that candidate then qualifies for the general election ballot. 10 ILL. COMP. STAT. 5/7-10.

First, the Illinois Election Code requires congressional candidates to gather signatures. To qualify for the general ballot in any election other than the first election following a redistricting, independent and third-party congressional candidates must obtain the signatures of "not less than 5%, nor more than 8%" of "the number of persons voting at the next preceding regular election." 10 ILL. COMP. STAT. 5/10-3.[2]

---

[1] The Illinois Election Code defines "established political party" as any political party that either (1) "polled for its candidate for Governor more than 5% of the entire vote cast for Governor" during "the last general election for State and county officers" or (2) "polled more than 5% of the entire vote cast within [any] territorial area or political subdivision" and "voted as a unit for the election of officers" during "the last election." 10 ILL. COMP. STAT. 5/10-2.

[2] For the first election following a redistricting, however, an independent congressional candidate need only gather 5,000 signatures to qualify for the general ballot. *See* 10 ILL. COMP. STAT. 5/10-3.

Candidates from established parties must obtain signatures from "0.5% of the qualified primary electors of his or her party in his or her congressional district" to qualify for the primary ballot. 10 ILL. COMP. STAT. 5/7-10. Second, the circulator of all signature petitions must certify the signatures were signed in the circulator's presence, were genuine, and, to the best of the circulator's knowledge, were signed by registered voters in the district. 10 ILL. COMP. STAT. 5/10-4. That certification must take place before a notary. *Id.* Third, all signatures must be obtained within a 90-day period and must be submitted between 134 and 141 days before the date of the election. *Id.*; 10 ILL. COMP. STAT. 5/10-6. Like the second hurdle, the third hurdle applies to all candidates.

Illinois's 13th Congressional District stretches across 14 predominantly rural counties in the middle of Illinois. Since the redistricting in 2011, Republican Rodney Davis has represented the district, winning elections in 2012, 2014, 2016, and 2018.

Gill ran against Davis in 2012 and 2016, but only the latter race is at issue here. In that race, Gill ran as an independent candidate for the first time. To satisfy the 5% signature requirement and make it onto the general ballot as an independent candidate, Gill needed to gather 10,754 signatures. Although Gill filed approximately 11,350 signatures with the ISBE, a later ISBE records examination concluded that some of the signatures were invalid. A hearing examiner for the SOEB found that only 8,491 of the signatures were valid signatures of registered, in-district voters—meaning Gill missed the statutory cutoff for appearing on the general ballot by over 2,000 signatures. The SOEB then issued its decision that Gill's

name should not appear on the November 8, 2016 general election ballot.

Gill and several registered voters in Illinois's 13th Congressional district sued the ISBE and the SOEB, alleging certain provisions of the Illinois Election Code violated their rights under the First and Fourteenth Amendments. The district court granted a preliminary injunction to Gill, which would have permitted him to appear on the 2016 general election ballot. The ISBE appealed, however, and sought a stay pending the resolution of its appeal. This court granted the stay, and Gill did not appear on the 2016 general election ballot. In December 2016, this court dismissed the appeal as moot and remanded to the district court.[3]

On remand, the parties filed cross-motions for summary judgment. The district court, believing it was bound by this circuit's decision in *Tripp v. Scholz*, 872 F.3d 857 (7th Cir. 2017), granted summary judgment to defendants. Gill appeals that decision.

---

[3] Although the appeal of the stay was dismissed as moot, a justiciable controversy remained under the "capable of repetition, yet evading review" doctrine. Under that well-recognized exception to mootness, a claim still presents a justiciable controversy if "(1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *FEC v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 462 (2007) (citing *Spencer v. Kemna*, 523 U.S. 1, 17 (1998)). Both factors were met in this case: Gill was unable to litigate his claims before the November 2016 election was held, and he has expressed his intent to run for office in 2020.

## II. Discussion

We review a district court's grant of summary judgment de novo. *Turubchuck v. Southern Ill. Asphalt Co.*, 958 F.3d 541, 548 (7th Cir. 2020) (citing *Physicians Healthsource, Inc. v. A-S Medication Solutions, LLC*, 950 F.3d 959, 964 (7th Cir. 2020)). Summary judgment is properly awarded if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED R. CIV. P. 56(a). Where, as here, both parties filed cross-motions for summary judgment, all reasonable inferences are drawn in favor of the party against whom the motion was granted. *See Tripp*, 872 F.3d at 862.

Gill's sole argument on appeal is that the district court erred by relying too heavily on *Tripp*. The facts in *Tripp* are similar to those in this case. The plaintiffs were two Green Party members who sought to run for state representative in Illinois's 115th and 118th representative districts. They raised claims under the First and Fourteenth Amendments when they failed to obtain the number of signatures required by the Illinois Election Code. *Id.* at 859–60. After an extensive analysis of the plaintiffs' claims and references to third-party candidates who had made it onto the general ballot in the past, this court in *Tripp* decided that the Illinois Election Code did not violate the First or Fourteenth Amendments. *Id.* at 864–72.

Before evaluating Gill's argument, we must acknowledge the relevant constitutional framework.

### A. Supreme Court Precedent

The fundamental right of political association is, in part, founded on "the right [of individuals] to band together in a political party to advance a policy agenda by electing the

party's members to office." *Libertarian Party of Ill. v. Scholtz*, 872 F.3d 518, 520–21 (7th Cir. 2017). When individuals create new political parties, they "advance[] the constitutional interest of like-minded voters to gather in pursuit of common political ends, thus enlarging the opportunities of all voters to express their own political preferences." *Norman v. Reed*, 502 U.S. 279, 288 (1992).[4] Under the First and Fourteenth Amendments, third-party candidates have a constitutional right in ensuring their political parties have ballot access. *Id.* The same right is invoked when politicians run as independent (non-party) candidates. *See Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 187 (1979).

But this right is not absolute. *See Libertarian Party of Ill. v. Rednour*, 108 F.3d 768, 773 (7th Cir. 1997). The Constitution grants states the "broad power to prescribe the 'Times, Places and Manner of holding Elections for Senators and Representatives.'" *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 217 (1986) (quoting U.S. CONST. art. I, § 4, cl. 1). In particular, the Supreme Court has recognized "[s]tates may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997); *see also Storer v. Brown*, 415 U.S. 724, 730 (1974) ("[A]s a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes.'').

---

[4] As our court has noted, third parties not only "inject[] new ideas" but sometimes "actually displac[e] one of the major parties." *Nader v. Keith*, 385 F.3d 729, 732 (7th Cir. 2004).

This case concerns only one type of election-related regulation—Illinois's regulations on ballot access for independent candidates. Two seminal Supreme Court cases are relevant here: *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992).

In *Anderson*, the Court determined courts reviewing constitutional challenges to state electoral regulations must:

> [F]irst consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests, it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.

U.S. at 789. The Court in *Anderson* recognized that when this balancing test is applied, "the State's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions." *Id.* at 788 (footnote omitted).

Almost a decade later, the Court in *Burdick* reaffirmed the use of *Anderson*'s "flexible" balancing test in another case involving state electoral regulations. 504 U.S. at 434. The *Burdick* Court recognized, however, that stricter scrutiny may be

appropriate when a challenged regulation imposes "severe" burdens on First and Fourteenth Amendment rights. *Id.* (citing *Norman*, 502 U.S. at 289).

Together, the balancing test created in *Anderson* and expounded upon in *Burdick* has often been referred to as the *Anderson-Burdick* balancing test. *See, e.g.*, Edward B. Foley, *Due Process, Fair Play, and Excessive Partisanship: A New Principle for Judicial Review of Election Laws*, 84 U. CHI. L. REV. 655, 674–86 (2017). But there is another aspect to the *Anderson-Burdick* balancing test. In *Anderson*, the Court declared the balancing test requires careful analysis of the facts and should "not be automatic." 460 U.S. at 789. And in more recent cases, the Court has reiterated "that [] court[s] must identify and evaluate the interests put forward by the State as justifications for the burden imposed by its rule" instead of "applying a[] 'litmus test' that would neatly separate valid from invalid restrictions." *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 190 (2008). These cases reject cursory or perfunctory analyses; precedent requires courts to conduct fact-intensive analyses when evaluating state electoral regulations.

### B.  The District Court's Opinion

The district court reasoned that this court's opinion in *Tripp* was "directly on point" because Gill "advanc[ed] the same challenges to the same restrictions at issue in *Tripp*." Because the district court presumed it was "[b]ound by *Tripp*," which upheld the constitutionality of the same sections of the Illinois Election Code challenged by Gill, the district court granted summary judgment to defendants. *See Tripp*, 872 F.3d at 864–72.

But this was in error. By relying on *Tripp*, the district court neglected to perform the fact-intensive analysis required for the *Anderson-Burdick* balancing test. That error is particularly evident because the facts in *Tripp* do not align with Gill's challenge. The plaintiffs in *Tripp* ran for seats in the Illinois House of Representatives, *id.* at 859, unlike Gill who ran for a seat in Congress. Because the plaintiffs in *Tripp* intended to run for seats in the Illinois House of Representatives, they needed to gather approximately 2,400 signatures to satisfy the 5% signature requirement. *Id.* at 861. But Gill wanted to run in Illinois's 13th Congressional District, which contains roughly 700,000 people—about seven times more than the representative districts at issue in *Tripp*. Because of the difference in population sizes between Illinois's congressional districts and Illinois's representative districts, Gill was required to obtain 10,754 signatures under the 5% signature requirement, over 8,000 more signatures than the plaintiffs in *Tripp*. And the districts in this case differ from those in *Tripp* in geographical size and location.[5] Illinois's 13th Congressional District covers over 5,793 square miles in central and western Illinois. The representative districts discussed in *Tripp* are about 3,000 square miles smaller and located in southern Illinois. *See id.* at 860–61. So compared to the plaintiffs in *Tripp*, Gill had the more difficult task of collecting more signatures from a different and larger geographical area.[6] The district court glossed over these

---

[5] Even the location of a district may impact a court's fact-intensive analysis under the *Anderson-Burdick* balancing test. Gathering signatures in rural districts may prove more difficult than doing so in urban districts and vice versa.

[6] Although Gill had a wider geographical area over which to collect signatures compared to the plaintiffs in *Tripp*, the facts of this case demonstrate the difficulty Gill faced in obtaining 10,754 signatures. Gill had the

factual differences when it concluded it was "bound by *Tripp*." True, the Illinois Election Code requires that candidates from non-established parties meet the 5% signature requirement in all elections except for those following a redistricting regardless of whether those candidates intend to run for a seat in the Illinois House of Representatives or in Congress. 10 ILL. COMP. STAT. 5/10-3. But the burden the 5% signature requirement imposes on candidates (and possibly the interests Illinois possesses in regulating those candidates) varies between elections and between districts. It is precisely these sorts of factual differences that the Supreme Court has stated must be considered by district courts when applying the *Anderson-Burdick* balancing test. *See Anderson*, 460 U.S. at 789; *Crawford*, 553 U.S. at 190.

Even if *Tripp* involved facts substantially similar to those in this case, another problem arises. When determining the character and magnitude of the burden imposed on third-party candidates seeking to run in Illinois, this court in *Tripp* found it "notable … that Illinois third party political candidates have successfully petitioned at least 5% of the vote in multiple districts across multiple elections." *Tripp*, 872 F.3d at 865. As evidence, the *Tripp* decision referenced four candidates who qualified for Illinois's general election ballot but were not from established parties: a Green Party candidate for the Illinois House of Representatives in 2002, two Green Party candidates for Congress in 2012, and an independent candidate for Congress in 2012. *Id.* The district court found these

---

help of 18 other circulators, and he testified that he devoted all time he was not working, commuting, eating, or sleeping to collecting signatures.

examples "'powerful evidence' that the burden of satisfying the 5% signature requirement is not severe." *Id.* at 865 (citing *Stone*, 750 F.3d at 683).

But, as Gill points out on appeal, all four of the candidates referred to in *Tripp* ran in election years immediately following a redistricting. In elections after a redistricting, the Illinois Election Code replaces the 5% signature requirement with a set of numerical signature requirements that depend on the race. 10 ILL. COMP. STAT. 5/10-3. For example, to qualify for the general election ballot in an election following a redistricting, independent or third-party congressional candidates must obtain at least 5,000 signatures and independent or third-party candidates for the Illinois House of Representatives must gather at least 1,500 signatures. *Id.* These numerical requirements are much less burdensome than the 5% signature requirement in play here. One need look no further than this appeal to see the difference in burdens between these requirements. Gill gathered 8,491 valid signatures—which was 2,000 signatures short under the 5% signature requirement. Had Gill run for Congress in an election after a redistricting, he would have passed the signature threshold by almost 3,500 signatures and qualified for the general election ballot. Thus, *Tripp*'s analysis of the burden imposed by 10 ILL. COMP. STAT. 5/10-3 is only persuasive as it pertains to a candidate subject to the numerical signature requirement.[7] Because Gill was subject to the 5% signature requirement and not the numerical

---

[7] When upholding the 5% signature requirement, this court in *Tripp* referenced candidates who were subject to the numerical signature requirement. Because the two requirements impose different burdens, those references were misplaced.

signature requirement, *Tripp*'s applicability to this case is limited.

### III. Conclusion

The district court erred by automatically concluding that the holding in *Tripp* controls this case instead of applying the fact-intensive analysis required by the *Anderson-Burdick* balancing test. The district court's reliance on *Tripp* also was problematic because *Tripp* referenced candidates who were regulated by provisions of the Illinois Election Code different than those at issue in this case.

For these reasons we REVERSE and REMAND for the district court to apply the fact-intensive *Anderson-Burdick* balancing test.